IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 22, 2024 Session[1]

## 4U2ASKY ENTERTAINMENT, INC. v. BLESSING CHIBUEZE OFFOR

**Appeal from the Chancery Court for Davidson County**
**No. 22-1147-IV      Russell T. Perkins, Chancellor**

_____

**No. M2023-00238-COA-R3-CV**

_____

A music publisher sued a musician for breach of contract. The musician, saddled with legal fees related to this litigation, eventually filed for bankruptcy and claimed certain musical works as his own intellectual property during the bankruptcy proceedings. The parties settled by agreeing that ownership rights to a subset of the musician's songs would be transferred to the publisher. Subsequently, the publisher contacted a licensing agency in pursuit of royalties, claiming ownership of more songs than were actually provided for under the settlement. The musician objected to the licensing agency, asserting that the publisher misrepresented the breadth of works it obtained in the settlement. This led to a second lawsuit with the music publisher asserting breach of contract against the musician. The musician filed a counterclaim against the publisher in this second lawsuit, asserting that the publisher's communications with the licensing agency amounted to tortious interference with the musician's existing and prospective business relationships. The publisher sought to dismiss the musician's counterclaim under the Tennessee Public Participation Act (TPPA). The trial court dismissed the publisher's TPPA petition. The publisher appeals the denial of its TPPA petition. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;
Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Tim Warnock and Keane Barger, Nashville, Tennessee, for the appellant, 4U2ASKY Entertainment, Inc.

---

[1] The court heard oral arguments in this matter at Belmont University College of Law in Nashville, Tennessee.

Robert A. Peal, Grace A. Fox, and Evan S. Rothey, Nashville, Tennessee, for the appellee, Blessing Chibueze Offor.

**OPINION**

I.

Blessing Chibueze Offor is a Nashville-based singer and songwriter. Mr. Offor appeared on the seventh season of NBC's music-focused television program *The Voice* and competed in several rounds before being eliminated from the competition. Mr. Offor capitalized on the exposure, pitching himself to members of the music industry.

In this process, one of the individuals with whom Mr. Offor met was Richard Williams, a representative of a Nashville-based corporation called 4U2ASKY Entertainment, Incorporated ("4U2ASKY"). Mr. Williams asked Mr. Offor to become one of 4U2ASKY's artists. Seeing an opportunity to establish himself in the Nashville music scene, Mr. Offor agreed. The parties signed a contract on August 18, 2015, which they called the "Short Form Agreement." Pursuant to the Short Form Agreement, 4U2ASKY paid Mr. Offor in exchange for control over the development of Mr. Offor's "musical talent/brand/entertainment career." For the next two years, Mr. Offor wrote and performed songs consistent with the terms of the Short Form Agreement.

Things soured, however, for the parties by 2017. The parties had still not signed a longer contract by this point, and Mr. Offor had also become concerned about the legitimacy of 4U2ASKY's practices. He alleged, for example, that 4U2ASKY "did not have a formal office"; rather, the parties had to conduct all formal business meetings in Mr. Offor's apartment. Mr. Offor also noted that 4U2ASKY promised separate publishing contracts that were "never provided." Mr. Offor asserted that "4U2ASKY did not have the industry knowledge, connections or resources to act as a publishing company or a record label." Things reached a head when 4U2ASKY's President, Monsieur Shawnellias Burgess, proposed what Mr. Offor called "a one-sided branding agreement rather than the promised publishing deal." Mr. Offor rejected 4U2ASKY's proposal and, having had enough, terminated the Short Form Agreement. Mr. Offor formally notified 4U2ASKY of his decision to terminate on December 15, 2017.

In response to Mr. Offor's notice, 4U2ASKY launched a seven-figure lawsuit in Davidson County Circuit Court, claiming that terminating the Short Form Agreement would deprive the corporation of millions of dollars of anticipated profits. Mr. Offor denied these claims, but 4U2ASKY's lawsuit drained Mr. Offor's personal finances. Mr. Offor's increasing indebtedness, which was almost entirely due to his legal fees, led him to file a petition for bankruptcy.

During the bankruptcy court proceedings, Mr. Offor identified 21 copyrighted songs

that might have value to his creditors, including 4U2ASKY. Those 21 songs constituted two of Mr. Offor's albums: *Roots* and *Guilty Pleasures*. Mr. Offor testified that those "are the songs that are out and could potentially be making money, which in my understanding is what [is] important. . . . [T]hese 21 songs are the only songs that anybody would be able to go on iTunes and listen to." Mr. Offor also disclosed that he had written other songs, but he clarified that his other songs had virtually no financial value, explaining, "they're all . . . either on my phone, [or] on a voice memo, you know, all but me and a few people have heard them."

Although Mr. Offor eventually received a bankruptcy discharge, 4U2ASKY remained unsatisfied. In its view, Mr. Offor owned many more songs than the batch of 21 songs that he disclosed to the bankruptcy court. 4U2ASKY communicated its belief to the United States Trustee. Based on the corporation's representations, the Trustee petitioned to have Mr. Offor's case reopened in the bankruptcy court.

Instead of reopening the case, however, the parties negotiated and signed an Agreed Order to address 4U2ASKY's concerns. The Agreed Order states in relevant part,

> 1. On August 18, 2015, [Mr. Offor] and 4U2ASKY entered into a written agreement (the "Short Form Contract") wherein [Mr. Offor] created intellectual property. . . . The Short Form Contract was terminated on December 15, 2017. The intellectual property created by [Mr. Offor] from August 18, 2015 through December 15, 2017 is hereinafter referred to as the "Short Form IP."
>
> . . .
>
> 5. Through discussions between the parties and further review of the Short Form Contract, the parties agree that one hundred percent (100%) of all right, title, and interest in the Short Form IP always belonged to and remains property of 4U2ASKY. Because [Mr. Offor] had no interest in the Short Form IP prior to the Petition Date, no interest in the Short Form IP would be part of a reopened bankruptcy estate.

The combined effect of paragraphs one and five is of critical importance to this appeal. Paragraph five states that 4U2ASKY has exclusive ownership over the "Short Form IP," and paragraph one explains that only songs created between August 18, 2015, and December 15, 2017 — the dates that the Short Form Agreement was created and later terminated — fall within the definition of "Short Form IP."

Several days later, Mr. Burgess wrote to the American Society of Composers, Authors and Publishers (ASCAP). ASCAP, a performing rights organization, works with musical artists on issues of licensing and royalties in connection with performances of

music.  In this letter to ASCAP, Mr. Burgess stated,

> Dear Sir or Madam,
>
> Pursuant to the Bankruptcy Filing by Blessing Offor, 4U2ASKY Entertainment, Inc. **owns 100% (Songwriter & Publishing) rights in the songs written (jointly or individually), performed, etc. of Blessing Offor** (IPI # 626062074).  (See Attached Order from Bankruptcy Court)[.]
>
> Mr. Offor claimed to own only 21 songs/copyrights from the albums "Roots" and "Guilty Pleasure."   (See attached Blessing Offor Schedule from Bankruptcy Court)[.]
>
> Please change **all of his rights** to 4U2ASKY Entertainment, Inc. (BMI IP#00529450936).  Again, that's Songwriter as well as Publisher.

(Emphasis Added).  Mr. Burgess attached a copy of the Agreed Order to this letter, but the phrase "Short Form IP" appears nowhere in this letter.  Rather, the letter states to ASCAP that 4U2ASKY owned "100%" of Mr. Offor's "songs written (jointly or individually), performed, etc."

Mr. Burgess subsequently penned a second letter to ASCAP entitled, in part, "second request."  In it, Mr. Burgess wrote:

> Dear Sir or Madam,
>
> Pursuant to the Bankruptcy Filing by Blessing Offor, 4U2ASKY Entertainment, Inc. **owns 100% (Songwriter & Publishing) rights in the songs written (jointly or individually), performed, etc. of Blessing Offor** (IPI # 626062074).
>
> Please change **all of his rights** to 4U2ASKY Entertainment, Inc. BMI IP#00529450936).  Again, that's Songwriter as well as Publisher.  See paragraph 5 of the Agreed Order which gives 100% of all right, title, and interest in creations under the Short Form IP/Contract between Blessing Offor and 4U2ASKY Entertainment, Inc.  **All of Blessing Offor's interests are and always have been 4U2ASKY's by Order of the Bankruptcy Court.**
>
> A LIST HAS BEEN ATTACHED (For the record this is a list not "the" list)

(Emphasis Added).

Unlike in his previous letter, Mr. Burgess mentions the "Short Form IP" subcategory in this communication. However, the letter also includes global assertions of ownership to "[a]ll of Blessing Offor's interests." Mr. Burgess also attached to this second letter an apparently unfinalized list of 355 songs that, according to him, 4U2ASKY owned "100% (Songwriter & Publishing) rights in." The list of songs attached to Mr. Burgess's second letter does not include the dates that each listed song was written or produced, making it difficult to ascertain from the face of the list whether each song fell within the definition of "Short Form IP" as defined in the Agreed Order.

The communications between 4U2ASKY and ASCAP did not proceed as 4U2ASKY wished. The record, for example, contains an email from an ASCAP representative that references communications between ASCAP and Mr. Burgess and reflects concern with 4U2ASKY's earlier communications. The email reads:

Mr. Burgess,

I have your email of October 5, 2021.

As I indicated in my last email, I forwarded your letter dated August 28, 2021[,] and the list of works attached to the letter to Mr. Offor's attorneys.

Having seen your list, Mr. Offor's attorneys have authorized ASCAP to send to you the attached list and to advise you that ASCAP should treat the works on his list as the "Short Form IP" referred to in the Bankruptcy Court's Agreed Order. Accordingly, ASCAP will be updating its records to indicate that Mr. Offor is no longer entitled to claim a writer's interest in any of the works on the attached list. So far as ASCAP is concerned, this should end the matter as it complies with your initial request. However, if it is 4U2ASKY Entertainment's position that the attached list is incomplete, it is 4U2ASKY Entertainment's responsibility to identify any other works that it believes were created by Mr. Offor during the period of August 18, 2015 – December 15, 2017 and take the matter up with Mr. Offor's attorneys.

Although from ASCAP's perspective the only relevant issue is now resolved, I am also taking the opportunity to respond briefly to the *seriatim* errors, misstatements, and baseless accusations in your last email.

First, the Bankruptcy Court's Agreed Order refers only to a "Short Form Contract" and the resulting "Short Form IP," so whatever works may have been encompassed by a "Long Form Agreement" would appear to be irrelevant. So, too, is there no relevance to the fact that the "EP" was ultimately completed.

Second, the number of songs created by Mr. Offor was never the issue – the issue has always been which songs he created during the period of August 18, 2015 – December 15, 2017.  For reasons I pointed out previously, your circulation of a list of work without the relevant information – that is, date of creation – was not at all helpful.  Indeed, just looking quickly at your list – about which you wrote: "(For the record this is a list but not 'the' list)" – I noted that at least six of the songs on your list were registered with ASCAP prior to August 18, 2015.

Third, you are correct that Mr. Offor testified at the meeting of creditors that he had written other songs that were of no value.  However, he did not say that "all known assets belonged to 4U2ASKY."  Nor does the Order either state or imply that "100% of the known assets belonged to 4U2ASKY." While you have correctly cited the language of Paragraph 6 of the Agreed Order, that language sheds no light on the issue of precisely which works constitute the "Short Form IP."  If you have not read the transcript of the meeting of creditors, you should ask your attorney for a copy.

Fourth, you should carefully read my October 5 email.  I never said I had spoken with Mr. Hildebrand – I merely cited his own examination of Mr. Offor [during the bankruptcy court proceedings] as set forth in the transcript of the meeting of the creditors.  As for your derogatory suggestion that my comments might warrant invocation of "Rule 11," I assume you are referring to Rule 11 of the Federal Rules of Civil Procedure.  If my assumption is correct, . . . I must also assume that you are unaware that sanctions under Rule 11 may only be imposed by a federal court for misrepresentations in "a pleading, written motion, or other paper . . . presented to the court . . . ." There were no misstatements in my October 5 email, but even if there were, that would certainly not be a matter that could be addressed by either the Bankruptcy Court or any other federal court.

Last, as ASCAP will not be complying with your request to update its records with respect to the works on the attached lists, your exegesis on the obligations of debtors such as Mr. Offor is interesting, but also entirely irrelevant.  And, your observation that "ASCAP has no standing here" may be correct, but that, too, is besides the point.  ASCAP holds no property of Mr. Offor's – it merely has been granted a nonexclusive right to license certain of his musical works for public performance.  It is for Mr. Offor and, in this case, 4U2ASKY Entertainment to identify those works that are to be removed from the ASCAP repertory pursuant to the Bankruptcy Court's Agreed Order.

ASCAP continues to reserve all rights and remedies with regard to this

matter.

There are a number of takeaways that can be gleaned from this email. First, Mr. Offor provided a list to ASCAP with a set of 95 dated songs that undisputedly fell within the Short Form IP period mentioned in the Agreed Order, and he relinquished any interest he might have had in those songs to 4U2ASKY, consistent with the Agreed Order. Second, 4U2ASKY suggested to ASCAP at some point during its communications that Mr. Offor was bound by the terms of a longer-term contract that might govern songs written from 2018 onwards, despite Mr. Offor categorically refusing to sign the longer-term agreement. Third, ASCAP confirmed that 4U2ASKY's undated, and, apparently, unfinalized "list" of claimed songs included songs that Mr. Offor wrote before the Short Form IP period began. Fourth, it appears that Mr. Burgess indicated that if ASCAP did not comply with his second request, he would pursue "Rule 11" sanctions. Fifth, ASCAP confirmed that it would take no action on 4U2ASKY's assertion that it was entitled to additional songs from Mr. Offor's catalogue without further proof of its ownership.

After receiving ASCAP's letter, 4U2ASKY filed a lawsuit against Mr. Offor, choosing this time to file in Davidson County Chancery Court. In its complaint, 4U2ASKY recounted the events of the bankruptcy proceedings and its interactions with ASCAP. 4U2ASKY did not attach the first letter to ASCAP to its complaint, submitting only the second letter that made reference to the "Short Form IP" as a subcategory. Then, 4U2ASKY asserted for the first time that Mr. Offor's list of 95 songs that he sent to ASCAP to inform the entity of which songs to transfer to 4U2ASKY's ownership was not, in fact, sent with that purpose in mind at all. Instead, 4U2ASKY maintained that Mr. Offor sent this list to ASCAP to stake a claim of ownership to the 95 songs mentioned on the list. This assertion does not find support in ASCAP's letter. Nevertheless, based on that premise, 4U2ASKY sought: (1) a declaratory judgment, asserting that the trial court should settle the question of what works fall within the definition of "Short Form IP" and (2) damages stemming from an alleged breach of contract, asserting that Mr. Offor was "exploiting the Short Form IP."

Mr. Offor filed a counterclaim against 4U2ASKY for tortious interference with prospective business relationships.[2] He alleged that 4U2ASKY's actions following the entry of the Agreed Order, including the corporation's interactions with ASCAP but also alleged communications with "members of the music industry, including record labels, business managers, producers and management agencies, with whom Offor had the opportunity of selling his services as a songwriter and recording artist," harmed his business relationships. Mr. Offor placed great emphasis on 4U2ASKY's representations

---

[2] Mr. Offor also sought his own declaratory judgment concerning the Short Form IP as a separate cause of action. This appeal concerns only Mr. Offor's tortious interference with business relationships claim. The parties agree that Mr. Offor's declaratory judgment claim is irrelevant to this appeal.

to ASCAP about the Agreed Order, contending that the company "falsely and knowingly [mis]represented to ASCAP the scope and import of the Agreed Order." Mr. Offor also asserted that 4U2ASKY agents represented to members of the broader music community "that it owned 100% of Offor's catalogue" in an effort "to punish Offor for no longer associating with 4U2ASKY, by deterring members of the music industry from working with Offor."

4U2ASKY responded to Mr. Offor's tortious interference counterclaim with a petition to dismiss pursuant to the Tennessee Public Participation Act ("TPPA"). The corporation stated in its petition that Mr. Offor's counterclaim targeted "the letter from 4U2ASKY to ASCAP." 4U2ASKY claimed that Mr. Burgess's communication with ASCAP constituted a statutory "exercise of the right of free speech" as that phrase is defined in the TPPA and asserted that it was entitled to an automatic dismissal of Mr. Offor's counterclaim. The corporation also asserted that it was Mr. Offor who was misrepresenting the terms of the Agreed Order to ASCAP. 4U2ASKY argued that Mr. Offor's tortious interference claim was aimed at chilling 4U2ASKY's protected speech, specifically its communications with ASCAP. 4U2ASKY also denied that Mr. Burgess was responsible for any misrepresentations. It also asserted that the principle of res judicata "does not permit [Mr.] Offor to relitigate the Agreed Order."

Mr. Burgess penned a declaration in support of 4U2ASKY's petition. In his declaration, Mr. Burgess stated that he did not intend to punish or harm Mr. Offor in his communications with ASCAP but rather acted "in a good-faith effort to assert and protect 4U2ASKY's lawful ownership rights in the Short Form IP, as established by the October 26, 2020, Agreed Order." In the same declaration, Mr. Burgess represented to the court that the Agreed Order purported to award 4U2ASKY ownership of "any songs Offor wrote on or before the date of October 26, 2020." Mr. Burgess further wrote,

> In my view, the Agreed Order cannot be read otherwise. The songs created by Offor can be owned either by Offor or 4U2ASKY. Offor disclosed and claimed ownership of just twenty-one songs. Offor agreed, pursuant to the Agreed Order, that the remaining songs were the Short Form IP owned by 4U2ASKY. So, other than the twenty-one songs, Offor has no basis to claim ownership in any other songs he created on or before October 26, 2020.

Responding to Mr. Offor's allegation that 4U2ASKY falsely represented the content and scope of the Agreed Order to ASCAP, Mr. Burgess insisted that his conduct was not a misrepresentation in part because "I attached the Agreed Order to my earlier . . . letter to ensure ASCAP could review the Agreed Order for itself to reach its own conclusions. By sending the Agreed Order to ASCAP, *I made certain* that I did not somehow misrepresent its terms." (Emphasis Added). Mr. Burgess did not address Mr. Offor's allegation that he or other 4U2ASKY representatives spread false information as to ownership of Mr. Offor's works to other members of the music industry in his declaration. Instead, Mr. Burgess only

stated that Mr. Offor could not have suffered damages from 4U2ASKY's communications because ASCAP did not, in fact, change the registration of any songs without Mr. Offor's consent. In advancing its TPPA petition, 4U2ASKY identified Mr. Burgess's communication with ASCAP as the protected speech that was being chilled.

Mr. Offor opposed 4U2ASKY's petition. He argued, among other things, that 4U2ASKY's communications concerning the ownership rights to his songs were not protected by the First Amendment; that 4U2ASKY had not demonstrated that its letters touched on a "matter of public concern," both in the conventional constitutional sense as well as in accordance with the definition that phrase is given by the TPPA; that 4U2ASKY's conduct met all the elements of tortious interference with prospective business relationships; and that 4U2ASKY's res judicata defense did not apply to his counterclaim.

Mr. Offor also penned a declaration of his own in opposition to 4U2ASKY's petition. In his declaration, Mr. Offor: highlighted the changing nature of Mr. Burgess's ownership claim, noting that his claim expanded from the original Short Form IP window to "ownership of all songs created before October 26, 2020"; explained that he believed 4U2ASKY's letters to ASCAP were not "isolated incident[s]" but rather part of a campaign to press "false, overreaching claims among members of the music industry, such as record labels, business managers, producers, management agencies, and collaborators, that it owns all of my song rights"; and contended that 4U2ASKY's communications "harmed a number of prospective business connections in the music industry" by, for example, "claiming ownership of rights for songs written *after* [the Agreement] was terminated while [he] was working with other songwriters, managers, labels, and more."

After holding a hearing, the trial court dismissed 4U2ASKY's TPPA petition. In its written order, the trial court made a series of critical determinations. First, while the trial court agreed with 4U2ASKY's position that its communications with ASCAP touched on matters that qualified as a statutory "matter of public concern" under the TPPA, it nevertheless concluded that 4U2ASKY failed to demonstrate that its communications fell within the protective scope of the United States Constitution or Tennessee Constitution. The trial court characterized the parties' disagreements as nothing more than "a dispute between two private parties . . . about music works, over which the parties assert differing rights." Based on that finding, the trial court concluded that "Mr. Offor's Counterclaim was not 'filed in response to [4U2ASKY's] exercise of the right of free speech, right to petition, or right of association.'" Second, the trial court concluded that Mr. Offor successfully established a prima facie case for tortious interference with business relationships. The trial court dispensed with 4U2ASKY's claim that res judicata barred Mr. Offor's counterclaim, finding that the only conduct identified by Mr. Offor's counterclaim occurred "after the Agreed Order was entered," not before, and that, "[a]s such, Mr. Offor's current Counterclaim could not have been litigated before the bankruptcy court." The trial court also declined to award under the TPPA attorney's fees, costs, or

expenses to either 4U2ASKY or Mr. Offor.

4U2ASKY timely appealed, arguing the trial court erred by dismissing its TPPA petition. In connection with that contention, 4UASKY argues that the trial court erred by concluding that its communication with ASCAP did not fall within the protective scope of the First Amendment. It also argues that trial court erred by concluding that Mr. Offor made his prima facie case for the tort of intentional interference with business relationships and by concluding that 4U2ASKY failed to establish a valid defense thereto based upon res judicata principles. Relatedly, 4U2ASKY asserts that trial court should have, in fact, awarded it attorney's fees, costs, and expenses. In opposition, Mr. Offor argues that the trial court properly dismissed 4U2ASKY's TPPA petition and properly declined to award it attorney's fees, costs, and expenses. In addition to contesting 4U2ASKY's arguments, Mr. Offor raises another basis, one rejected by the trial court, in support of the dismissal of the TPPA petition. Specifically, he asserts that 4U2ASY's communications with ASCAP as to ownership rights of the songs were not even related to a matter of public concern under the TPPA. Mr. Offor also asserts that the trial court erred by declining to award him attorney's fees and costs.

II.

This case presents significant complexities, so to avoid losing sight of the forest for the trees,[3] we begin with an overview of the TPPA generally and of how the various issues advanced on appeal interrelate and fit within the framework of the TPPA. As the Tennessee Supreme Court has explained,

> The Tennessee Public Participation Act ("TPPA") was enacted in 2019 and is Tennessee's version of an anti-SLAPP statute. The acronym "SLAPP" stands for strategic lawsuits against public participation. The primary aim of a SLAPP is not to prevail on the merits, but rather to chill the speech of the defendant by subjecting him or her to costly and otherwise burdensome litigation. Because SLAPPs threaten to interfere with the exercise of constitutionally protected rights, more than twenty states have adopted anti-SLAPP statutes to protect defendants from the often punishing process of defending such suits.

---

[3] "The idiom 'can't see the forest for the trees' describes a situation where someone is so focused on the details (represented by the 'trees') that they fail to understand or perceive the larger situation, picture, or context (represented by the 'forest')." Jasper Hartwell, *Idioms Origins and Meanings: A Dictionary of Popular Sayings, Phrases and Expressions* 32 (2023). One of the earliest uses of this idiom appears in John Heywood's 1546 collection of proverbs in which he wrote, "You cannot see the wood for the trees." *Id*. With the passage of time, wood was replaced with forest, especially in American English. *Id*. On deeper philosophical level, "[t]he idiom touches on a recurring them in philosophy . . . : the tension between the particulars and universals." *Id*.

- 10 -

The TPPA attempts to strike a balance between two competing interests. On the one hand, it seeks to encourage and safeguard the constitutional rights of persons to petition, to speak freely, to associate freely, and to participate in government to the fullest extent permitted by law. At the same time, it also seeks to protect the rights of persons to file meritorious lawsuits for demonstrable injury.

Like many other anti-SLAPP statutes, the TPPA establishes a procedure for swift dismissal of non-meritorious claims. The defendant in a SLAPP suit may file a petition to dismiss the action within sixty days of service of the action or at any later time that the court deems proper.

Courts engage in a two-step analysis to rule on a TPPA petition. First, the court determines whether the petitioner has made a prima facie case that the challenged lawsuit is based on, relates to, or is in response to [the petitioner's] exercise of the right to free speech, right to petition, or right of association. If the petitioner has not made this showing, the court denies the petition. But if the petitioner succeeds at the first step, the court next determines whether the respondent has made a prima facie case for each essential element of his claim. If the respondent meets this burden, the court must deny the petition unless the petitioning party establishes a valid defense to the claims in the legal action. Otherwise, the court must grant the petition and dismiss the suit with prejudice.

. . .

In ruling on a petition, a court may consider supporting and opposing sworn affidavits stating admissible evidence and admissible evidence presented by the parties.

. . .

The TPPA also has a fee shifting provision. If a court grants a TPPA petition for dismissal, it "shall award" the petitioner "[c]ourt costs, reasonable attorney's fees, discretionary costs, and other expenses incurred in filing and prevailing upon the petition" along with "[a]ny additional relief, including sanctions, that the court determines necessary to deter repetition of the conduct by the party who brought the legal action or by others similarly situated." Conversely, if a court finds that a petition was frivolous or solely dilatory, the court may award to the respondent costs and fees incurred to oppose the petition.

*Charles v. McQueen*, 693 S.W.3d 262, 267-68 (Tenn. 2024) (citation modified).

The Tennessee Supreme Court's thorough explanation of the TPPA's purpose, structure, and framework helps to make more comprehensible the various areas of disagreement between the parties in this complex case and how they interrelate. Turning thereto, 4U2ASKY has raised an issue on appeal addressed to the first step of the TPPA framework by asserting that the trial court erred in concluding that Mr. Offor's counterclaim[4] was not "based on, relate[d] to, or [made] in response to [4U2ASKY's] exercise of the right to free speech." *See* Tenn. Code Ann. § 20-17-105(a). To prevail on appeal in challenging the trial court's dismissal of its TPPA petition, 4U2ASKY must show that the trial court erred in its determination that 4U2ASKY's communications do not fall within the protective scope of the First Amendment to the United States Constitution. If 4U2ASKY does not demonstrate such error, then its central contention on appeal – that the trial court erred by dismissing its TPPA petition – dissolves. In other words, 4U2ASKY's challenge cannot be successful without prevailing on this issue.

While prevailing on the aforementioned issue is necessary for 4U2ASKY to be successful in its challenge to the trial court's dismissal of its TPPA petition, success on this issue is not sufficient. To establish that the trial court erred by dismissing its TPPA petition, 4U2ASKY must also prevail on either its second or third issue on appeal, though it does not need to prevail upon both. For its second issue on appeal, 4U2ASKY challenges the trial court's conclusion regarding the second step of the TPPA framework. *See* Tenn. Code Ann. § 20-17-105(a). With regard to the second step, 4U2ASKY asserts the trial court erred by concluding that Mr. Offor presented sufficient evidence to establish a prima facie case in support of his counterclaim for tortious intentional interference with business relationships. *See Charles*, 693 S.W.3d at 267. For its third issue on appeal, 4U2ASKY challenges the trial court's conclusion that 4U2ASKY's res judicata argument was insufficient to "establish[] a valid defense" to Mr. Offor's counterclaim. *See id.* at 267-68 (quoting Tenn. Code Ann. § 20-17-105(b)-(c)). As noted above, in addition to needing to be successful with regard to its first issue on appeal, 4U2ASKY must demonstrate error by the trial court as to either 4U2ASKY's second or third issue to establish that the trial court erred in dismissing its TPPA petition. If unsuccessful as to both issue two and issue three, then irrespective of whether 4U2ASKY demonstrates error as to issue one, it cannot succeed with its challenge on appeal to the trial court's dismissal of its TPPA petition.

4U2ASKY, assuming the correctness of its positions on appeal, argues that the trial court also erred by failing to award it attorney's fees, costs, and expenses in accordance with a mandatory provision of the TPPA. If it fails to show that the trial court erred by

---

[4] The term "legal action" in the TPPA is defined broadly. It encompasses not only the filing of a lawsuit generally but also individual "claim[s], cause[s] of action, petition[s], cross-claim[s], **or counterclaim[s]**" as well as any other type of "request for legal or equitable relief initiated against a private party." Tenn. Code Ann. §20-17-103(5) (emphasis added).

- 12 -

dismissing its TPPA petition, then 4U2ASKY cannot demonstrate error by the trial court in declining to award it attorney's fees, costs, and expenses. The two are inextricably linked.

Adding to the complexity, Mr. Offor, while arguing in support of the trial court's dismissal of 4U2ASKY's TPPA petition and countering 4U2ASKY's arguments in relation to the issues noted above, asserts that the trial court made two errors. One, Mr. Offor contends that there is an additional basis that, though rejected by the trial court, supports the trial court's ultimate conclusion that 4U2ASKY's TPPA petition should be dismissed. Addressing this purported error, Mr. Offor contends 4U2ASKY's communications with ASCAP are not even related to a matter of public concern under the TPPA; accordingly, the TPPA petition should also have been dismissed on this basis. Two, Mr. Offor contends that the trial court erred by failing to award him attorney's fees and costs under a discretionary provision of the TPPA.

III.

As for our standard of review in considering this appeal, we review de novo the question of whether a party established a prima facie case for purposes of a TPPA petition. *SmileDirectClub, Inc. v. NBCUniversal Media, LLC*, 708 S.W.3d 556, 570 (Tenn. Ct. App. 2024); *see Charles*, 693 S.W.3d at 272-73; *see also Black v. Baldwin*, No. M2024-00151-COA-R3-CV, 2025 WL 1566392, at *2 (Tenn. Ct. App. June 3, 2025), *perm. app. denied* (Tenn. Oct. 8, 2025) (stating that "[w]e review a trial court's decision to grant or deny a TPPA petition under a de novo standard of review"). Similarly, interpretation of the statutory provisions of the TPPA "entails a question of law, which we review de novo upon the record with no presumption of correctness for the determination of the courts below." *Flade v. City of Shelbyville*, 699 S.W.3d 272, 281 (Tenn. 2024).

The Tennessee Supreme Court has delineated the process that courts are to follow when ruling upon a TPPA petition as follows:

> First, the court determines whether the petitioner has made a prima facie case that the challenged lawsuit "is based on, relates to, or is in response to [the petitioner's] exercise of the right to free speech, right to petition, or right of association." [Tenn. Code Ann.] § 20-17-105(a). If the petitioner has not made this showing, the court denies the petition. *See id.* § 20-17-105(b). But if the petitioner succeeds at the first step, the court next determines whether the respondent has made a prima facie case for each essential element of his claim. *Id.* If the respondent meets this burden, the court must deny the petition unless "the petitioning party establishes a valid defense to the claims in the legal action." *Id.* § 20-17-105(b)-(c). Otherwise, the court must grant the petition and dismiss the suit with prejudice. *Id.* § 20-17-105(e).

*Flade*, 699 S.W.3d at 283-84.

The Tennessee Supreme Court has also explained the evidentiary showing that is necessary to make a prima facie case under the TPPA:

Black's Law Dictionary defines "prima facie case" as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Prima facie case*, Black's Law Dictionary 1441 (11th ed. 2019). Consistent with this definition, in at least some contexts, courts have equated a "prima facie case" to the quantum of evidence that is sufficient to survive a motion for summary judgment or a motion for directed verdict. *See, e.g., Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1292 (11th Cir. 2021) (holding that, to satisfy his "burden of establishing a prima facie case of personal jurisdiction," a plaintiff "must present enough evidence to withstand a motion for a directed verdict"); *Am. Cent. City, Inc. v. Joint Antelope Valley Auth.*, 281 Neb. 742, 807 N.W.2d 170, 183 (2011) (defining prima facie case as "evidence [that] sufficiently establishes elements of a cause of action and, notwithstanding a motion for a directed verdict in a jury trial or a motion to dismiss in a nonjury trial, allows submission of the case to the fact finder for disposition"); *LaGrant v. Gulf & W. Mfg. Co.*, 748 F.2d 1087, 1090 (6th Cir. 1984) (holding, in an age discrimination case, that "[a] prima facie case is one where there is sufficient evidence to withstand a motion for summary judgment or for a directed verdict"). The Tennessee Court of Appeals, for example, has explained that "avoid[ing] a directed verdict under Tenn. R. Civ. P. 50" requires the non-moving party to present "enough evidence to establish at least a prima facie case." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) (quoting *Richardson v. Miller*, 44 S.W.3d 1, 30 (Tenn. Ct. App. 2000)); *see also Pickard v. Berryman*, 24 Tenn. App. 263, 142 S.W.2d 764, 769 (1939) (explaining that, in the sense in which "the phrase 'prima facie case'" was used there, it meant "merely that [the] evidence, assuming it to be true, is sufficient to prevent his suit being dismissed, as on a directed verdict, and to require the case to be submitted to the triers of fact").

To establish a "prima facie" case under the TPPA, a party must present enough evidence to allow the jury to rule in his favor on that issue. This evidence may include "sworn affidavits stating admissible evidence" and "other admissible evidence." Tenn. Code Ann. § 20-17-105(d). As is the case when a court rules on a motion for summary judgment or motion for directed verdict, the court should view the evidence in the light most favorable to the party seeking to establish the prima facie case and disregard countervailing evidence. *See, e.g., Griffis v. Davidson Cnty. Metro. Gov't*, 164 S.W.3d 267, 284 (Tenn. 2005) (summary judgment); *Conatser v.*

- 14 -

*Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995) (directed verdict).

*Charles*, 693 S.W.3d at 280-81; *see also Blythe v. Forsythe*, No. M2023-01463-COA-R3-CV, 2025 WL 3095415, at *4 (Tenn. Ct. App. Nov. 6, 2025); *Pragnell v. Franklin*, No. E2022-00524-COA-R3-CV, 2023 WL 2985261, at *10 (Tenn. Ct. App. Apr. 18, 2023). The Tennessee Supreme Court has also indicated that "[i]n determining whether a rational jury could find in the party's favor on that issue, the court also must keep in mind the applicable standard of proof." *Charles*, 693 S.W.3d at 281.

IV.

At the heart of the TPPA stands its provision that "[i]f a legal action is filed in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may petition the court to dismiss the legal action." Tenn. Code Ann. § 20-17-104(a). There is no contention that the "right to petition" or "right of association" are implicated in the present case; rather, this case centers upon whether 4U2ASKY's communication with ASCAP was an exercise of 4U2ASKY's free speech rights. Under the TPPA, the "'[e]xercise of the right of free speech' means a communication made in connection with a matter of public concern or religious expression that falls within the protection of the United States Constitution or the Tennessee Constitution." Tenn. Code Ann. § 20-17-103(3). The TPPA further defines component parts of this definition. Communication is defined as "the making or submitting of a statement or document in any form or medium, including oral, written, audiovisual, or electronic." Tenn. Code Ann. § 20-17-103(1). Under the TPPA, a

"[m]atter of public concern" includes an issue related to:

(A) Health or safety;
(B) Environmental, economic, or community well-being;
(C) The government;
(D) A public official or public figure;
(E) A good, product, or service in the marketplace;
(F) A literary, musical, artistic, political, theatrical, or audiovisual work; or
(G) Any other matter deemed by a court to involve a matter of public concern;

Tenn. Code Ann. § 20-17-103(6).

In considering the applicability of the TPPA, as a foundational matter, the TPPA petitioning party must be the one exercising the right. *See Cartwright v. Thomason Hendrix, P.C.*, No. W2022-01627-SC-R11-CV, 2025 WL 3523045, at *7 (Tenn. Dec. 9, 2025). On top of this foundation, the definition has three required components, meaning a

- 15 -

petitioner can only establish that he or she was engaged in an "exercise of the right of free speech" if he or she proves "(1) 'a communication' that was (2) 'made in connection with a matter of public concern' and (3) 'falls within the protection of the United States Constitution or the Tennessee Constitution.'" *Gersper v. Turner*, No. M2022-01136-COA-R3-CV, 2024 WL 4554706, at *4 (Tenn. Ct. App. Oct. 23, 2024) (quoting Tenn. Code Ann. § 20-17-103(3)).

While the parties agree that 4U2ASKY's parley with ASCAP was manifested through "communication[s]" under the TPPA, *see id.*; Tenn. Code Ann. § 20-17-103(3), the parties duel over whether a prima facie case has been made as to the other two components of the definition of the "exercise of the right of free speech." It is 4U2ASKY that defends the trial court's conclusion on the issue of whether its communications with ASCAP were upon a "matter of public concern," while Mr. Offor argues against the trial court's understanding of this term. *See* Tenn. Code Ann. § 20-17-103(3). The parties then flip roles as defender and opponent of the trial court's decision, when addressing the trial court's understanding of whether 4U2ASKY's communications with ASCAP "fall[] within the protection of the United States Constitution." For that issue, Mr. Offor agrees with the trial court's conclusion that 4U2ASKY's communication was unprotected while 4U2ASKY insists that its communication falls within the protection of the First Amendment.

We turn our attention first to considering the parties' contestation over the "matter of public concern" component of 4U2ASKY's prima facie case for establishing its "exercise of the right of free speech" under the TPPA. The trial court in the present case determined that 4U2ASKY made a sufficient showing that its August 2021 letter to ASCAP "dealt with 'a matter of public concern.'" In support of this conclusion, the trial court cited Tennessee Code Annotated section 20-17-103(6)(F): "an issue related to . . . [a] . . . musical . . . work."

On appeal, Mr. Offor asserts the trial court's conclusion on this issue was in error. Mr. Offor insists that, when properly considered, the absence of a matter of public concern provides another basis to support the trial court's ultimate conclusion that 4U2ASKY's petition should be dismissed. 4U2ASKY counters, asserting that the trial court's conclusion on the matter of public concern issue was entirely proper and in accordance with the TPPA.

The parties' disagreement mostly stems from a difference of understanding as to how the TPPA's statutory definition of "matter of public concern" interacts, if at all, with the understanding the same phrase receives in First Amendment constitutional jurisprudence. 4U2ASKY maintains that the General Assembly expressly defined the term "matter of public concern" under the TPPA and argues that courts should go no further than applying the definition as written in the TPPA. *See* Tenn. Code Ann. § 20-17-103(6). Mr. Offor disagrees. He notes that the entire statutory scheme of the TPPA was expressly

- 16 -

created to fully protect the rights guaranteed by the First Amendment, *see* Tenn. Code Ann. § 20-17-102 ("The purpose of this chapter is to encourage and safeguard the constitutional rights of persons . . . to speak freely . . . to the fullest extent permitted by law . . . . This chapter is consistent with and necessary to implement the rights protected by . . . the First Amendment to the United States Constitution, and shall be construed broadly to effectuate its purposes and intent."). Given that purpose, Mr. Offor contends that it would make little sense to not consider the United States Supreme Court's jurisprudence when addressing what constitutes a "matter of public concern" under the TPPA.

The Tennessee Supreme Court has explained the undertaking of statutory interpretation as follows:

> This Court's role in statutory interpretation is "to determine what a statute means." Specifically, we must decide "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." Original public meaning is discerned through consideration of the statutory text in light of "well-established canons of statutory construction."

> We give the words of a statute their "natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." In the absence of statutory definitions, we look to authoritative dictionaries published around the time of a statute's enactment.

> We consider the whole text of a statute and interpret each word "so that no part will be inoperative, superfluous, void or insignificant." We also consider "[t]he overall statutory framework." "[S]tatutes 'in pari materia'— those relating to the same subject or having a common purpose—are to be construed together . . . ."

*State v. Deberry*, 651 S.W.3d 918, 924-25 (Tenn. 2022) (internal citations omitted).

When interpreting statutes, Tennessee courts "give terms their natural and ordinary meaning in their statutory context unless the statute defines them." *Lawson v. Hawkins Cnty.*, 661 S.W.3d 54, 59 (Tenn. 2023). "When the statute itself defines a term, . . . we must follow that definition even if it differs from the term's ordinary meaning." *Williams v. Smyrna Residential, LLC*, 685 S.W.3d 718, 723 (Tenn. 2024). In general, "[w]hen a statutory definition states that it 'includes' specific items," the Tennessee Supreme Court has "held that the 'enumerated items are illustrative, not exclusive.'" *State v. Marshall*, 319 S.W.3d 558, 561 (Tenn. 2010) (quoting *Gragg v. Gragg*, 12 S.W.3d 412, 415 (Tenn. 2000)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012) (noting that "[t]he verb to include introduces examples, not an exhaustive list").

Turning to the statutory language, the General Assembly in the "Chapter definitions" section of the TPPA defined "[m]atter of public concern." Tenn. Code Ann. § 20-17-103(6)). As noted above, the General Assembly defined the term for TPPA purposes as follows:

"Matter of public concern" includes an issue related to:

(A) Health or safety;
(B) Environmental, economic, or community well-being;
(C) The government;
(D) A public official or public figure;
(E) A good, product, or service in the marketplace;
(F) A literary, musical, artistic, political, theatrical, or audiovisual work; or
(G) Any other matter deemed by a court to involve a matter of public concern;

Tenn. Code Ann. § 20-17-103(6).

Addressing this statutory definition, this court has observed that "matters of public concern are 'broadly defined' under the statute." *Doe v. Roe*, 638 S.W.3d 614, 618 (Tenn. Ct. App. 2021). In *Doe v. Roe*, this court addressed an argument pressing for the adoption of an interpretation of the statute that was more in accord with a constitutional understanding of what constitutes a matter of public concern than what was seemingly provided for by the plain language of the statute in defining a matter of public concern. *Id*. at 619-21. This court declined to embrace such an approach, rejecting a "narrower interpretation [of matter of public concern] than the one provided to us by the clear statutory language of the TPPA." *Id*. at 622.

In the present case, Mr. Offor's argument points toward potential tension between the definition set forth in the TPPA and the understanding of what constitutes a matter of public concern within various constitutional doctrines, such as employee speech[5] and intentional infliction of emotional distress cases.[6] Mr. Offor's argument, however, goes

---

[5] *See, e.g.*, *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 386 (2011).

When a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern. If an employee does not speak as a citizen, or does not address a matter of public concern, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

*Id*.

[6] *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (determining that when speech takes place

too far in asking this court to ignore the plain language of the definition set forth by the General Assembly. This we cannot do.

The General Assembly has indicated that "an issue related to" "[a] . . . musical . . . work" qualifies statutorily as a matter of public concern for TPPA purposes. Tennessee courts have repeatedly recognized the broadness of the words "relating to" or "related to" when employed by the General Assembly in statutes. *See*, *e.g.*, *Castillo v. Rex*, 715 S.W.3d 321, 333 (Tenn. 2025) (indicating that "'relating to activities of the QIC' is broad"); *Cordell v. Cleveland Tenn. Hosp.*, *LLC*, 544 S.W.3d 331, 338 (Tenn. Ct. App. 2017) ("No doubt, 'related to' and other similar phrases carry a broad meaning."). In considering such language, the Tennessee Supreme Court has cited the Merriam-Webster definition for "relate to" as meaning "to be connected with (someone or something); to be about (someone or something)." *Castillo*, 715 S.W.3d at 333. We cannot say that a communication asserting ownership of a musical work is not related to that musical work; it plainly is.

Furthermore, for at least three reasons, two of which are inherent within the statutory design of the TPPA, Mr. Offor's argument overstates the tension between the constitutional understanding of a matter of public concern in various free speech doctrines and the statutory definition of a matter of public concern under the TPPA. One, insofar as the TPPA fails to embrace as a matter of statutory public concern in the TPPA's subparts (A) through (F) of Tennessee Code Annotated section 20-17-103(6) speech that qualifies as a matter of public concern constitutionally, subpart (G) appears to resolve any potential underinclusiveness concern. This subpart does so by embracing as a matter of public concern statutorily under the TPPA "[a]ny other matter deemed by a court to involve a matter of public concern." Tenn. Code Ann. § 20-17-103(6)(G). Given subpart (G), it is difficult to see how the TPPA could be underinclusive in its understanding of what constitutes a matter of public concern when considered in relation to a constitutional understanding of what qualifies as a matter of public concern. After all, to the extent that the statutory definition is narrower, subpart (G) captures any constitutional matter of public concern that is not captured already by subparts (A) through (F).

Two, on other side of the coin, Mr. Offor's concern is also misplaced in relation to any worry about the TPPA being overinclusive, that is, embracing within the scope of its protection a communication that does not qualify as a matter of public concern constitutionally. Where a matter of public concern is relevant to a constitutional doctrine implicated by the communication in the particular case, the constitutional understanding of what constitutes a matter of public concern remains of significance under the TPPA. It remains of significance in such cases not as part of the statutory definition of matter of

---

in "a public place on a matter of public concern, that speech is entitled to 'special protection' under the First Amendment [and that] [s]uch speech cannot be restricted simply because it is upsetting or arouses contempt").

public concern but because the communication still has to "fall[] within the protection of the United States Constitution or the Tennessee Constitution" to be safeguarded by the TPPA. Thus, insofar as the TPPA is overinclusive in its definition regarding its understanding of a matter of public concern in comparison with a constitutional understanding, the statutory overinclusiveness is addressed through the latter part of the petitioner's prima facie case, having to "fall[] within the protection of the United States or Tennessee Constitution."

Three, if we were to read the constitutional understanding of matter of public concern in a manner that displaces the express statutory language of the TPPA, as Mr. Offor invites us to do, such an approach would actually undermine the constitutional protection purposes of the TPPA not further it. It would create more, not less, tension between the TPPA and the scope of what is constitutionally protected speech. While whether speech is upon a matter of public concern is relevant to assessing whether speech is protected in relation to some free speech doctrines, for example government employee speech cases[7] or intentional infliction of emotional distress cases,[8] being upon a matter of public concern is not invariably a predicate for speech being protected under the First Amendment to the United States Constitution. The United States Supreme Court expressly made this point in *Connick v. Myers*,[9] a foundational case delineating what constitutes a matter of public concern. While the Supreme Court embraced therein the "matter of public concern" requirement as a trigger for speech protections being applicable in cases involving termination of a government employee in connection with his or her speech, the Court noted that "[w]e in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction." *Connick*, 461 U.S. at 147. While speech on a matter of public concern stands at "heart of the First Amendment's protection,"[10] speech need not be regarding or addressed to a matter of public concern for it to fall within the protective ambit of the First Amendment's broad protective sweep across a variety of free speech doctrines. *See, e.g.*, *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 766-67 (9th Cir. 2006) (concluding that the district court erred by applying matter of public concern analysis as a prerequisite for any constitutional protection in the context of a student speech case, as student speech need not be on a matter of public concern to be protected); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir. 1993) (explaining that, while commercial speech enjoys constitutional protection, the safeguards thereof are lesser, in part, because it is less likely to involve a matter of public concern). The approach suggested by Mr. Offor would

---

[7] *See, e.g.*, *Borough of Duryea, Pa.*, 564 U.S. at 386.

[8] *See, e.g.*, *Snyder*, 562 U.S. at 458.

[9] 461 U.S. 138 (1983).

[10] *Snyder*, 562 U.S. at 451-52.

- 20 -

impose speech being on a matter of public concern, as the term is constitutionally understood, as a requirement across all categories of First Amendment doctrine, even in areas where the constitutional understanding of speech being on a matter of public concern has no application. In other words, Mr. Offor's approach is actually more discordant with the framework and purpose of the TPPA. Accordingly, we conclude that the trial court did not err in adhering to the plain language of the TPPA and determining that the speech at issue fell within the ambit of a statutory matter of public concern under the TPPA.

V.

We turn next to the parties' dispute over the trial court's conclusion that 4U2ASKY failed to make its prima facie case that its communication with ASCAP "fell within the protection of the United States Constitution or the Tennessee Constitution." Consideration of the parties' arguments and determining whether the trial court erred by concluding that 4U2ASKY's communication with ASCAP falls outside the boundaries of the First Amendment requires addressing a series of sub-issues. There are complexities along this journey.

As an overview of what follows in this section, we begin by addressing the scope of 4U2ASKY's challenge to the trial court's ruling – noting what 4U2ASKY has challenged and what it has not. We then turn to considering arguments advanced by 4U2ASKY in its opening brief on appeal. 4U2ASKY first argues that the trial court erred because speech need not implicate "state or governmental ties" to fall within the ambit of the protections of the First Amendment. 4U2ASKY next argues that only "fighting words" are exempt from First Amendment protection, that its communication with ASCAP does not constitute fighting words, and that the use of spoken or written words that do not constitute fighting words necessarily falls within the protection of the First Amendment. Mr. Offor counters that there are other categories of speech, other than fighting words, that receive little or no protection under the First Amendment. Delving deeper into the First Amendment doctrine, we examine the boundaries of the First Amendment and the dueling presumptions underlying the trial court's ruling and the parties' arguments. We next turn to Mr. Offor's argument that the proper prism for analyzing whether 4U2ASKY's communication is protected is through the commercial speech doctrine. Applying this doctrine, Mr. Offor asserts that 4U2ASKY's communications with ASCAP do not enjoy First Amendment protection because they constitute "unprotected false or misleading commercial speech." 4U2ASKY disagrees with Mr. Offor's characterization of its speech as "false or misleading" and asserts that its letters to ASCAP should not be assessed through the prism of commercial speech doctrine, instead presuming them to be fully protected. Having made this trek, we ultimately conclude that while part of the trial court's rationale is faulty, that the trial court did not err as to its ultimate conclusion that the communication at issue in the present case is outside the boundaries of First Amendment protection.

We begin by taking the first step of the journey through clarifying what 4U2ASKY

challenges on appeal and what it does not. To the extent that the trial court determined that the speech did not fall within the protection of the Tennessee Constitution, 4U2ASKY has not challenged that decision on appeal. Accordingly, in the absence of any developed argument as to the Tennessee Constitution, we only consider whether the communication falls within the scope of the United States Constitution and do not consider whether the communication falls, also or alternatively, within the scope of the Tennessee Constitution. *See Sneed v. Bd. of Pro. Resp.*, 301 S.W.3d 603, 615 (Tenn. 2010) (noting "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her"). 4U2ASKY's argumentation on appeal is entirely focused on asserting that its communication with ASCAP falls within the protection of the First Amendment to the United States Constitution. Therefore, 4U2ASKY's challenge to the trial court's dismissal of its TPPA petition rises and falls upon whether its communication falls within the protective scope of the First Amendment: "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

42UASKY argues the trial court erred by concluding that its communication was unprotected because it did "not implicate any state or governmental ties." The trial court's precise rationale for its conclusion that the communication was unprotected is challenging to pin down. Insofar as the trial court concluded that 4U2ASKY's communication with ASCAP fell outside the protection of the United States Constitution because it did not address "state or governmental ties," the trial court's understanding of the scope of the First Amendment is in error. [11]

---

[11] In addressing whether the communication fell within the scope of the protections of the United States Constitution, the trial court observed that "[t]he parties' claims do not implicate any state or governmental ties or involvements that could potentially have an impact on the content of speech." In making this point, the trial court utilized a *see* signal and cited *Manhattan Community Access Corporation v. Halleck*, 587 U.S. 802, 808-11 (2019). The issue before the United States Supreme Court in the case cited by the trial court was the application of the state action doctrine. *Manhattan Cmty. Access Corp.*, 587 U.S. 802, 804-05 (2019). Nowhere in its opinion in the present case does the trial court make a determination that there was no state action implicated in the present case. To the extent that the trial court's decision might suggest such a conclusion, any such determination would be misplaced; the state action in the present case appears in the form of a state court being asked to apply a state tort law to the parties' communication, purportedly in violation of the First Amendment. *See*, *e.g.*, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991) ("Our cases teach that the application of state rules of law in state courts in a manner alleged to restrict First Amendment freedoms constitutes 'state action' under the Fourteenth Amendment."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) ("Although this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press. It matters not that that law has been applied in a civil action and that it is common law only, though supplemented by statute. The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.") (internal citation omitted); J. Thomas McCarthy & Roger E. Schechter, 2 *Rights of Publicity and Privacy* § 8:21 (2d ed. 2025) (regarding tort litigation between private parties, "when a private litigant invokes the courts to enjoin or punish 'speech,' then there is indeed 'governmental action' by the courts").

While political speech and public discourse over matters related to self-governance are at the epicenter of the First Amendment,[12] the protective sweep of the First Amendment is much, much broader. The protection of freedom of speech "creates 'an open marketplace' in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012). Speech need not, however, be controversial or even contested to be protected for "[e]ven 'dry information, devoid of advocacy, political relevance, or artistic expression'—such as technical scientific information, instructions, and recipes—constitutes speech." *Gilliam v. Gerregano*, No. M2022-00083-SC-R11-CV, 2025 WL 617603, at *8 (Tenn. Feb. 26, 2025), *cert. denied*, No. 25-107, 2025 WL 3506977 (U.S. Dec. 8, 2025). Nor is speech being highbrow or erudite a requirement for protection, for "[c]rudely violent video games, tawdry TV shows, and cheap novels and magazines are no less forms of speech than *The Divine Comedy*." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 796 n.4 (2011). Simply stated, one does not have to be speaking or writing about government or governmental actors to enjoy the protections afforded by the broad sweep of the First Amendment and its safeguard of the freedom of speech. *See*, *e.g.*, *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984) (noting that "even though political speech is entitled to the fullest possible measure of constitutional protection, there are a host of other communications that command the same respect"); *Kaahumanu v. Hawaii*, 682 F.3d 789, 798 (9th Cir. 2012) ("The First Amendment protects more than political speech.").

Having concluded that communication need not be political discourse to be protected under the First Amendment, 4U2ASKY attempts to build upon this foundation through its assertion that the only type of written or spoken speech that are not protected under the First Amendment is speech that constitutes fighting words. 4U2ASKY asserts that its communication with ASCAP did not constitute fighting words. It is true that the

---

[12] *See*, *e.g.*, *Mills v. State of Ala.*, 384 U.S. 214, 218 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."). In his text *Free Speech: A Philosophical Enquiry*, Professor Frederick Schauer notes the following:

> [The] *political* basis for a principle of freedom of speech leads to a position of prominence under the argument for speech relating to public affairs, and even more prominence for criticism of governmental officials and policies. Such freedom is held to be necessary for two purposes. First, freedom of speech is crucial in providing the sovereign electorate with the information it needs to exercise its sovereign power, and to engage in the deliberate process requisite to the intelligent use of that power. Second, freedom to criticize makes possible holding governmental officials, as public servants, properly accountable to their masters, the population at large.

Frederick Schauer, *Free Speech: A Philosophical Enquiry* 35-36 (1982) (emphasis in original).

United States Supreme Court has indicated that fighting words "are generally proscribable under the First Amendment," describing fighting words as "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Virginia v. Black*, 538 U.S. 343, 359 (2003) (quoting *Cohen v. California*, 403 U.S. 15, 20 (1971)). To be a fighting word, the communication must be "a direct personal insult or an invitation to exchange fisticuffs." *Texas v. Johnson*, 491 U.S. 397, 409 (1989). Fighting words are unleashed face to face. *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997). We agree with 4U2ASKY that the fighting words doctrine has absolutely no application under the circumstances of the present case involving its written communication with ASCAP. The trial court, however, did not find that the communication to ASCAP constituted fighting words, nor does Mr. Offor contend that the communication constituted fighting words.

However, contrary to 4U2ASKY's contention and as Mr. Offor quite properly notes, fighting words are not alone as a category of speech falling outside the protection of the First Amendment. There are a variety of categories of speech that receive diminished, circumscribed, or no protection under the First Amendment. *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (listing, among others, incitement to imminent lawless action, obscenity, defamation, speech integral to criminal conduct, child pornography, fraud, and true threats). Accordingly, that 4U2ASKY's communications do not constitute fighting words does not, despite its assertion to the contrary, resolve whether its communication with ASCAP is protected by the First Amendment.

While the preceding analysis in this section addresses a rationale for the trial court's conclusion that the speech was not unprotected — that it is not political speech — and an argument from 4U2ASKY for why the speech is protected — that the speech does not constitute fighting words — our conclusions on these issues do not resolve the central question before us. To the contrary, both points only modestly move us forward in understanding whether 4U2ASKY's communication with ASCAP is protected under the First Amendment. Accordingly, we must go deeper into First Amendment doctrine to determine whether the trial court properly concluded that 4U2ASKY's communication with ASCAP fell outside the scope of the protection of the First Amendment.

In wrestling with the extraordinarily varied and complex questions arising in relation to matters implicating freedom of speech, the United States Supreme Court has developed an intricate tapestry of analysis, ranging from the broadly applicable rules which span across the domain of First Amendment analysis to narrowly focused doctrines tied to specific contexts or content. A more complex aspect of freedom of speech, and an undertheorized one at that, rests at an even more foundational level, focusing on whether the First Amendment applies at all. Professor Frederick Schauer has thoughtfully examined this foundational level. In doing so, he asserts the following:

Although the First Amendment refers to freedom of "speech," much speech

remains totally untouched by it.  Antitrust law, securities regulation, the law of criminal solicitation, and most of the law of evidence, for example, involve legal control of speech lying well beyond the boundaries of the First Amendment's concern.  It is not that such regulation satisfies a higher burden of justification imposed by the First Amendment.   Rather, the First Amendment does not even show up in the analysis. . . .

The history of the First Amendment is the history of its boundaries.  Though the strength of American free speech doctrine is located chiefly in the formidable barriers that countervailing interests must overcome in order to prevail against free speech values, these barriers have emerged within the boundaries of a largely accepted understanding of the scope of the First Amendment itself.  There have been many important disagreements about what rules should apply when a law or practice infringes upon the First Amendment, but far fewer disagreements about whether, as a threshold matter, the First Amendment is even implicated at all.  We may not always have known how to resolve First Amendment cases, but at least we knew them when we saw them.

As contemporary debates about the threshold applicability of the First Amendment to topics such as copyright, securities regulation, panhandling, telemarketing, antitrust, and hostile-environment sexual harassment demonstrate, however, questions about the involvement of the First Amendment in the first instance are often far more consequential than are the issues surrounding the strength of protection that the First Amendment affords the speech to which it applies.  Once the First Amendment shows up, much of the game is over.  But the question whether the First Amendment shows up at all is rarely addressed, and the answer is too often simply assumed. . . .

At times the First Amendment's boundaries have figured in the case law and academic commentary, as with the familiar debates about whether obscenity, libel, fighting words, and commercial advertising are inside or outside the coverage of the First Amendment.  But more often, the boundary disputes have been invisible.  Little case law and not much more commentary explain why the content-based restrictions of speech in the Securities Act of 1933, the Sherman Antitrust Act, the National Labor Relations Act, the Uniform Commercial Code, the law of fraud, conspiracy law, the law of evidence, and countless other areas of statutory and common law do not, at the least, present serious First Amendment issues.

Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765, 1765-68 (2004).

Professor Schauer's thoughtful article on the First Amendment's boundaries is now more than two decades old, and the doctrine has advanced. However, his core concern remains relevant to this case, as the parties struggle through identifying those First Amendment boundaries in the unfamiliar terrain presented by the circumstances of this case. Underlying the arguments of the parties and the trial court's conclusion are presumptions as to whether, given its nature, 4U2ASKY's communication with ASCAP is of a type where the First Amendment shows up or not.

Seeking to move beyond presumptions and endeavoring to determine where in the complex tapestry of First Amendment jurisprudence the communication at issue in the present case fits, Mr. Offor contends that the appropriate way to assess the speech at issue is by considering it through the analytical prism of the commercial speech doctrine. Analyzed through that prism, Mr. Offor contends that 4U2ASKY's communication ultimately constitutes unprotected speech outside the boundaries of First Amendment protection. 4U2ASKY insists that its communication with ASCAP should not be assessed through the prism of the commercial speech doctrine and that its communication instead enjoys the full protection of the First Amendment, rather than the lesser protection afforded under the commercial speech doctrine. Underlying 4U2ASKY's argument is a presumption that, if it can escape from the commercial speech category, its communication will enjoy fuller, more robust protection.

That presumption stands, however, upon an extremely shaky foundation in the present case. "For many years, commercial speech received no First Amendment protection."[13] Insofar as speech existed within the broader world of commercial and business activity, the regulation thereof was not considered the regulation of speech but of economic activity and, accordingly, subject to the full reach of government's power of regulation over economic activity that existed following the United States Supreme Court's retreat from the robust protection of business activities during the *Lochner*[14] era.[15]

---

[13] Martin H. Redish & Kyle Voils, *False Commercial Speech and the First Amendment: Understanding the Implications of the Equivalency Principle*, 25 Wm. & Mary Bill Rts. J. 765, 770 (2017).

[14] *Lochner v. New York*, 198 U.S. 45 (1905). "During the *Lochner* era of the early twentieth century, the United States Supreme Court emphasized the importance of economic rights by overturning legislation that restricted the right of contract or of individual economic autonomy. However, with the fall of economic rights jurisprudence in the late 1930s, the Court increasingly upheld legislation restricting economic rights." Richard E. Levy, *Escaping* Lochner's *Shadow: Toward A Coherent Jurisprudence of Economic Rights*, 73 N.C. L. Rev. 329, 329 (1995).

[15] *See*, *e.g.*, C. Edwin Baker, *Commercial Speech: A Problem in the Theory of Freedom*, 62 Iowa L. Rev. 1, 4 (1976); John A. Powell & Stephen Menendian, *Beyond Public/Private: Understanding Excessive Corporate Prerogative*, 100 Ky. L.J. 43, 74 (2012) ("Since commercial speech was considered economic activity, laws regulating economic activity were subject to rational basis review."); Martin H. Redish, *The First Amendment in the Marketplace: Commercial Speech and the Values of Free Expression*,

Traditionally, "[t]he rule that communications in the 'commercial sector' of our society are outside the system of freedom of expression . . . . has been widely observed . . . ."[16]

That, with certainty, changed via the United States Supreme Court's decision in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976). In that case, a challenge was brought to a law that prevented pharmacists from disseminating information to customers about the prices of prescription drugs. *Id*. at 752. The United States Supreme Court concluded that the communication of prices of prescription drugs falls within the ambit of protection afforded by the First Amendment. *Id*. at 770. The Court explained its reasoning as follows:

> As to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate. Appellees' case in this respect is a convincing one. Those whom the suppression of prescription drug price information hits the hardest are the poor, the sick, and particularly the aged. A disproportionate amount of their income tends to be spent on prescription drugs; yet they are the least able to learn, by shopping from pharmacist to pharmacist, where their scarce dollars are best spent. When drug prices vary as strikingly as they do, information as to who is charging what becomes more than a convenience. It could mean the alleviation of physical pain or the enjoyment of basic necessities.

> Generalizing, society also may have a strong interest in the free flow of commercial information. Even an individual advertisement, though entirely "commercial," may be of general public interest. The facts of decided cases furnish illustrations: advertisements stating that referral services for legal abortions are available, that a manufacturer of artificial furs promotes his product as an alternative to the extinction by his competitors of fur-bearing mammals, and that a domestic producer advertises his product as an alternative to imports that tend to deprive American residents of their jobs. Obviously, not all commercial messages contain the same or even a very great public interest element. There are few to which such an element, however, could not be added. Our pharmacist, for example, could cast himself as a commentator on store-to-store disparities in drug prices, giving his own and those of a competitor as proof. We see little point in requiring him to do so, and little difference if he does not.

___

39 Geo. Wash. L. Rev. 429, 431 (1971); *see also*, Thomas H. Jackson & John C. Jeffries Jr., *Commercial Speech: Economic Due Process and the First Amendment*, 65 Va. L. Rev. 1, 30 (1979) (arguing against the United States Supreme Court's embrace of speech protections for commercial speech because it unsettled regulatory authority over economic activity).

[16] Thomas I. Emerson, *The System of Freedom of Expression* 414 (1970).

Moreover, there is another consideration that suggests that no line between publicly "interesting" or "important" commercial advertising and the opposite kind could ever be drawn. Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable. And if it is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered. Therefore, even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy, we could not say that the free flow of information does not serve that goal.

*Virginia State Bd. of Pharmacy*, 425 U.S. at 763-65. In safeguarding commercial speech, the United States Supreme Court has observed that "[t]he commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993).

Much of the discussion of commercial speech, both in scholarly discourse and judicial opinions, is regarding the lesser protection thereof in comparison with political discourse and to deciphering the location of the lines between public-facing commercial speech, like the advertising in *Virginia State Board of Pharmacy* case, and political discourse. What often becomes lost in these discussions is that "commercial speech in fact receives far greater constitutional protection than many forms of commercial communication."[17] Accordingly, the "[c]ommercial speech doctrine is . . . not merely about the boundary that separates commercial speech from public discourse, but also about the boundary that separates the category of 'commercial speech' from the surrounding sea of commercial communications that do not benefit from the protections of the doctrine" at all.[18]

When we consider that line, the United States Supreme Court has looked to "act with caution in confronting First Amendment challenges to economic legislation that serves legitimate regulatory interests." *Friedman v. Rogers*, 440 U.S. 1, 10 n.9 (1979). The Court has observed that "the State does not lose its power to regulate commercial

---

[17] Robert Post, *The Constitutional Status of Commercial Speech*, 48 UCLA L. Rev. 1, 20 (2000).

[18] *Id*. at 21.

activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik v. Ohio State Bar Ass'n.*, 436 U.S. 447, 456 (1978). The Supreme Court has long noted that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *United States v. Hansen*, 599 U.S. 762, 783 (2023) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). In this vein, "notwithstanding our nation's profound commitment to freedom of speech, it has never been the law that criminal or tort liability may be avoided merely because the wrongdoer uses speech to accomplish his illicit purpose." Rodney A. Smolla, 1 *Smolla and Nimmer on Freedom of Speech* § 10:35 (2025). The regulation of conduct or of a verbal act does not necessarily become government regulation of speech merely because of the presence of speech in the performance of the commercial activity. 1 *Smolla and Nimmer on Freedom of Speech* § 2:52 ("There are very few endeavors in life that do not implicate communication, including virtually all economic transactions. Yet it would be absurd to treat all regulation of economic activity requiring communication as regulation of 'speech' within the meaning of the First Amendment."); Robert A. Sedler, *The "Law of the First Amendment" Revisited*, 58 Wayne L. Rev. 1003, 1010-11 (2013) (indicating that when government is restricting the conduct manifested through verbal acts such as perjury, bribery, illegal solicitation, and discrimination carried out by means of speech or writing that "it is irrelevant for constitutional purposes how the act . . . is being carried out"). That is, "[n]ot all acts that are communicative, even those that involve speech in the literal sense, constitute 'speech' in the sense contemplated by the First Amendment." 1 *Smolla and Nimmer on Freedom of Speech* § 2:52 The United States Supreme Court has expressly indicated that "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct" and "that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

These concepts intersect with the present case given the nature of 4U2ASKY's communication with ASCAP and Mr. Offor's claim being one of asserting that 4U2ASKY engaged in tortious interference with business relationships. In setting forth its general principles, the Restatement (Third) of Unfair Competition observes that "[t]he freedom to engage in business and to compete for . . . prospective customers is a fundamental premise of the free enterprise system. . . . Liability is imposed . . . only in connection with harm resulting from particular methods of competition determined to be unfair."[19] In developing tort limitations in this arena, "[a]ll business torts involve unfair business practices."[20] Or more precisely, "[b]usiness torts redress wrongs committed in commercial competition.

---

[19] Restatement (Third) of Unfair Competition § 1 (1995).

[20] James L. Robertson, *The Law of Business Torts in Mississippi*, 15 Miss. C. L. Rev. 331, 387 (1995)

These torts establish the boundary between fair and unfair business competition."[21]  When considering these torts, a challenge is to determine "where fair competition ends and actionable practices begin."[22]  As the United States Supreme Court has noted, "business tort laws . . . provide remedies for various competitive practices thought to be offensive to proper standards of business morality."  *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998).

For torts protecting contractual or business relationships, the concept is to protect against "wrongful intermeddling" by others in contractual or economic relationships.[23]  Foundations for this safeguard can be found in the idea that "the notion is intolerable that a man should be protected by the law in the enjoyment of property, once it is acquired, but left unprotected by the law in his efforts to acquire it."[24]

In adopting the tort of intentional interference with business relationships, the Tennessee Supreme Court made plain that the tort is addressed to "*improper* conduct extending beyond the bounds of doing business in a freely competitive economy." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 700 (Tenn. 2002) (emphasis in original).  With regard the tort of intentional interference with business relationships, the Tennessee Supreme Court held that

> [L]iability should be imposed on the interfering party provided that the plaintiff can demonstrate the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means, *see*, *e.g.*, *Top Serv. Body Shop* [*Inc. v. Allstate Ins. Co.*], 582 P.2d [1365,] 1371 [(Or. 1978)]; and . . . (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc.*, 71 S.W.3d at 701.

The Court also adopted

[t]he discussion in § 766B comment c of the Restatement (Second) of Torts,

---

[21] 5A Minn. Prac., Methods Of Practice § 2.1 (4th ed.).

[22] Charles M. Hosch, *Business Torts*, 56 SMU L. Rev. 1171, 1171 (2003).

[23] *Ellis v. City of Valdez*, 686 P.2d 700, 706-07 (Alaska 1984).

[24] *Brennan v. United Hatters of N. Am., Loc. No. 17*, 65 A. 165, 171 (N.J. 1906).

which provides:

> The relations protected against intentional interference by the rule stated in this Section include any prospective contractual relations, except those leading to contracts to marry, if the potential contract would be of pecuniary value to the plaintiff. Included are interferences with the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts. Interference with the exercise by a third party of an option to renew or extend a contract with the plaintiff is also included. *Also included is interference with a continuing business or other customary relationship not amounting to a formal contract.*

*Id*. at 701 n.4.

In addressing this tort, the Tennessee Supreme Court further stated that

> [i]t is clear that a determination of whether a defendant acted "improperly" or possessed an "improper" motive is dependent on the particular facts and circumstances of a given case, and as a result, a precise, all-encompassing definition of the term "improper" is neither possible nor helpful. However, with regard to improper motive, we require that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff. *See Leigh Furniture & Carpet Co.* [*v. Isom*], 657 P.2d [293,] 307-08 [(Utah 1982)].
>
> Moreover, in the attempt to provide further guidance, we cite the following methods as some examples of improper interference: those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules, *see id.* at 308; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship, *see Duggin*[ *v. Adams*], 360 S.E.2d [832,] 836 [(Va. 1987)] (citing *Top Serv. Body Shop, Inc.*, 582 P.2d at 1371 n.11); and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition, *see id.* at 837.

*Id*. at 701 n.5.

With business torts, including the tort of intentional interference with business relationships, private actors, instead of governmental regulatory bodies, bring suits that

help to provide contour to the boundaries of permissible business practices. The tort constrains business practices that constitute "*improper* conduct." *Id.* at 700.

Nevertheless, "when a tortious interference claim rests on statements that are protected by the First Amendment and no additional improper conduct is alleged, the tortious interference claim must fail."[25] And, there is a diverse and diffuse array of circumstances in which the First Amendment could be implicated, and quite appropriately so, in defending against such a tort action on constitutional grounds. Courts have found First Amendment protections to be implicated in a variety of circumstances — what follows is not an exhaustive list but merely offers some insight into some of the circumstances where the First Amendment has been implicated in connection with this tort. "The right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott . . . ." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 914 (1982). Similarly, public protest activity has been protected against a claim of tortious interference. *City of Keene v. Cleaveland*, 118 A.3d 253, 255-61 (N.H. 2015). Additionally, "[p]etitions to a governmental agency are privileged under the First Amendment and cannot form the basis of a claim for tortious interference with business interests." *Hotel St. George Assocs. v. Morgenstern*, 819 F. Supp. 310, 320 (S.D.N.Y. 1993). Acts that were designed to effectuate political and social change could not support a tortious interference claim. *Nat'l Org. for Women, Inc. v. Scheidler*, No. 86 C 7888, 1997 WL 610782, at *24-31 (N.D. Ill. Sept. 23, 1997). The speech, as to which the tort claim was being advanced, having been upon a matter of public concern, as constitutionally understood, also protected against successfully advancing a claim of tortious interference. *Cousins*, 283 A.3d at 1161.

As to the latter, it is important to understand that the difference between a "matter of public concern" for statutory purposes under the TPPA and the United States Supreme Court's understanding of the phrase "matter of public concern" for constitutional purposes. The Court explained what is meant constitutionally by a matter of public concern in *Snyder, v. Phelps*, 562 U.S. 443 (2011). Therein, the Court explained as follows:

> "[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."
>
> "'[N]ot all speech is of equal First Amendment importance,'"

---

[25] *Cousins v. Goodier*, 283 A.3d 1140, 1160 (Del. 2022).

however, and where matters of purely private significance are at issue, First Amendment protections are often less rigorous. That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: "[T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas"; and the "threat of liability" does not pose the risk of "a reaction of self-censorship" on matters of public import.

We noted a short time ago, in considering whether public employee speech addressed a matter of public concern, that "the boundaries of the public concern test are not well defined." Although that remains true today, we have articulated some guiding principles, principles that accord broad protection to speech to ensure that courts themselves do not become inadvertent censors.

Speech deals with matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." The arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."

Our opinion in *Dun & Bradstreet*, on the other hand, provides an example of speech of only private concern. In that case we held, as a general matter, that information about a particular individual's credit report "concerns no public issue." The content of the report, we explained, "was speech solely in the individual interest of the speaker and its specific business audience." That was confirmed by the fact that the particular report was sent to only five subscribers to the reporting service, who were bound not to disseminate it further. To cite another example, we concluded in *San Diego v. Roe* that, in the context of a government employer regulating the speech of its employees, videos of an employee engaging in sexually explicit acts did not address a public concern; the videos "did nothing to inform the public about any aspect of the [employing agency's] functioning or operation."

Deciding whether speech is of public or private concern requires us to examine the "'content, form, and context'" of that speech, "'as revealed by the whole record.'" As in other First Amendment cases, the court is obligated "to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech,

including what was said, where it was said, and how it was said.

*Snyder*, 562 U.S. at 451-53 (internal citations omitted).

The point of the above discussion, indicating that business activities may be performed via spoken and written words without becoming speech and the nature of the intentional interference with business relationships tort, is not to suggest that such tort claims are immune from the reach of the First Amendment. They plainly are not. Nor is it to suggest a firm barrier keeps such actions confined outside the reach of the First Amendment; to the contrary, as reflected through the examples set forth above, the barrier is clearly permeable. The point is that 4U2ASKY's assumption that its communication with ASCAP necessarily falls within the ambit of the First Amendment, if the communication neither constitutes fighting words nor commercial speech, is decidedly misplaced. Unlike publication torts, for example defamation,[26] false light,[27] or disclosure of private facts,[28] which are born of, and inherently grounded in, speech,[29] the tort at issue in the present case, tortious interference with business relationships, is born of and grounded in conduct constituting improper business practices. That distinction is not without effect. The publication torts are intertwined from the outset with endeavoring to curtail speech; they exist in an area of the tapestry of the First Amendment of presumed protections and litigation jousting over the applicability of exceptions. They are children of speech and limitations upon speech. Alternatively, the tort of intentional interference

---

[26] "To establish a prima facie case of defamation, the plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Davis v. The Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001). The actual malice standard applies as to speech regarding public officials or figures while negligence is sufficient for private individuals seeking to recover. *Charles*, 693 S.W.3d at 268-69.

[27] To establish a claim for false light, a plaintiff must "prove that (1) a party gave publicity to a matter in a way that placed him in a false light; (2) 'the false light in which [he] was placed would be highly offensive to a reasonable person[;]' and (3) the party 'had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [he] would be placed.'" *Charles*, 693 S.W.3d at 280. However, "[w]hen the false light plaintiff is a private individual and the speech at issue relates only to a matter of private concern, the negligence standard applies." *Id*. at 269.

[28] One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
    (a) would be highly offensive to a reasonable person, and
    (b) is not of legitimate concern to the public.

Restatement (Second) of Torts § 652D (1977).

[29] Certain torts "emanate from activities with speech dimensions." Kenneth S. Abraham & G. Edward White, *First Amendment Imperialism and the Constitutionalization of Tort Liability*, 98 Tex. L. Rev. 813, 842 (2020).

with business relationships is, as noted by the Tennessee Supreme Court, a tort of "*improper* conduct,"[30] which curtails activities that are out of bounds in business competition. Rather than speech regulation, the tort is grounded in restrictions upon the manner in which business is conducted which, to borrow from Professor Schauer, is a place where the First Amendment generally does not show up.

As noted above, "[a]lthough the First Amendment protections extended to commercial speech are fewer and weaker than those extended to public discourse, commercial speech in fact receives far greater constitutional protection than many forms of commercial communication."[31] This case may present one those many forms that are entirely separated from the First Amendment. The written words at issue in the present case are a private communication by 4U2ASKY to ASCAP directing it to switch to whom it distributes royalty payments for the performances of certain songs. While accomplished through written words, this communication appears to be more of an act, switching the recipient of royalties, than it is speech as understood and protected under the First Amendment. The circumstances of this case do not present a tortious interference with business relationship claim in which the underlying circumstances closely mirror a publication tort suit. Instead, 4U2ASKY's argument is functionally equivalent to accepting that *anyone* who contacts tenants informing them that they have a new landlord and should remit their rent payment, accordingly, or *any entity* claiming to be a new mortgage servicer who should now receive one's mortgage payments is necessarily engaged in the exercise of free speech rather than the conducting of business activities. We are wary of such a notion. *See*, *e.g.*, 1 *Smolla and Nimmer on Freedom of Speech* § 2:52 ("There are very few endeavors in life that do not implicate communication, including virtually all economic transactions. Yet it would be absurd to treat all regulation of economic activity requiring communication as regulation of 'speech' within the meaning of the First Amendment.").

The question in the present case remains, though: whether there is some basis for pulling the communication in this case out of simply being a form of private law restriction upon business conduct and into the ambit of speech protection under the First Amendment. There are a variety of potential bases stitched across the complex tapestry of the First Amendment that could warrant further consideration. Moving beyond presumptions, commercial speech is, however, the only additional potential basis that is addressed by the parties in the present case, and, accordingly, the only additional one that we consider in this appeal. In other words, we do not examine every stitch or pattern within the tapestry; rather, the only additional portion of tapestry that we examine is an area placed before us by the parties in the present case. *See Sneed*, 301 S.W.3d at 615 (noting "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for

---

[30] *Trau-Med of Am.*, *Inc.*, 71 S.W.3d at 700.

[31] Post, *supra* n.17, at 20.

him or her").

In considering case law relevant to this matter, we are cognizant that the analysis of whether speech qualifies as commercial speech generally arises in the context of cases in which the speech at issue is public-facing speech, such as advertising, in cases where the dividing line is between robust First Amendment protection and the lesser protection afforded under the First Amendment to commercial speech. Accordingly, most of the case law development with regard to the commercial speech doctrine has not been aimed at distinguishing business activities that fall entirely outside the ambit of the First Amendment from commercial speech that receives some First Amendment protection.[32]

As for what commercial speech is, the United States Supreme Court has described commercial speech as "speech which does no more than propose a commercial transaction." *Virginia State Bd. of Pharmacy*, 425 U.S. at 762. This understanding was, subsequently, described by the Supreme Court as "the core notion of commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983). In attempting to determine what constituted commercial speech, the Supreme Court looked, however, less generally and more specifically at the presence of three factors: (1) the speech was an advertisement, (2) it referred to a specific product, and (3) the communication had an economic motivation. The Supreme Court made clear that it was not the existence of any of these factors in isolation but instead the confluence thereof – "[t]he combination of all these characteristics" – that render the speech commercial speech. *Id*. at 66-67. The Tennessee Supreme Court has described commercial speech as "expression related solely to the economic interests of the speaker and his or her audience." *BellSouth Advert. & Publ'g Corp. v. Tennessee Regul. Auth.*, 79 S.W.3d 506, 518 (Tenn. 2002). Addressing argumentation in relation to commercial speech, the United States Supreme Court has recognized that there is doubt as to "the precise bounds of the category of expression that may be termed commercial speech." *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 637 (1985). Whatever the precise metes and bounds of commercial speech, if the commercial speech is false, deceptive, or misleading, or proposes an illegal transaction, then it is outside the protective shield of the First Amendment. *Id*. at 638. The United States Supreme Court made clear that this inquiry is "a threshold matter" and if this threshold is not passed, "then the speech is not protected by the First Amendment." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002). In assessing whether the commercial speech threshold has been surpassed, there is no scienter requirement for a communication to fall outside of scope of protection of the First Amendment. *See, e.g., Id.*; *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980). Under the commercial speech doctrine, there is no requirement "to prove the commercial speaker's culpable mental state, as its listener-centered focus recognizes that false or misleading commercial expression interferes with

---

[32] Post, *supra* n.17, at 21.

listeners' informed decisionmaking regardless of the speaker's scienter."[33]

Assuming for purposes of argument that 4U2ASKY can make it to the threshold, and viewing the evidence in the light most favorable to 4U2ASKY as to its prima facie case, we still cannot conclude that 4U2ASKY makes it past the threshold. 4U2ASKY claimed ownership of "100% (Songwriter & Publishing) [of the] rights in the songs written (jointly or individually), performed, etc. of Blessing Offor." 4U2ASKY sent communications to ASCAP that sweepingly claimed complete ownership over all intellectual property ever created by Blessing Offor. 4U2ASKY spoke in terms of its ownership over "right, title, and interest" to songs within Mr. Offor's catalogue and provided a list to ASCAP of hundreds of songs to which it claimed ownership, including numerous songs that fell outside of the Short Form IP window of August 18, 2015, to December 15, 2017. At a minimum, 4U2ASKY's list of songs it claimed ownership over included songs as to which it did not have an ownership interest. While 4U2ASKY claims, as a fallback position, that any purported misrepresentation in its communications to ASCAP was cured by attaching a copy of the Bankruptcy Court's order to its communications, we cannot agree that this was sufficient to render its communication not misleading. As noted above, the standard with regard to the applicability of the commercial speech doctrine does not require that 4U2ASKY intentionally engage in misleading conduct, only that its communication was misleading. Thus, even if 4U2ASKY could get to the threshold for entry into the protection of the First Amendment for commercial speech, it cannot get past it.

VI.

As a separate basis for its conclusion that 4U2ASKY's TPPA petition should be dismissed, the trial court also concluded that Mr. Offor made his prima facie case for his claim for tortious interference with business relationships. *See* Tenn. Code Ann. § 20-17-105(b) (providing that "(b) If the petitioning party meets this burden, the court shall dismiss the legal action unless the responding party establishes a prima facie case for each essential element of the claim in the legal action"); *see also*, *e.g.*, *Charles*, 693 S.W.3d at 267-68. Relatedly, the trial court also determined that the 4U2ASKY failed to establish a valid defense to Mr. Offor's claim. *See* Tenn. Code Ann. § 20-17-105(c) ("Notwithstanding subsection (b), the court shall dismiss the legal action if the petitioning party establishes a valid defense to the claims in the legal action."); *see also*, *e.g.*, *Charles*, 693 S.W.3d at 267-68.

4U2ASKY argues the trial court erred in dismissing its TPPA petition because Mr. Offor did not adequately make his prima facie case for intentional interference with business relationships. In opposition, Mr. Offor argues in support of the trial court's

---

[33] Helen Norton, *What Twenty-First-Century Free Speech Law Means for Securities Regulation*, 99 Notre Dame L. Rev. 97, 141–42 (2023).

conclusion that he did make his prima facie case. Having determined that 4U2ASKY failed to make its own prima facie showing that its communication falls within the protection of the First Amendment, 4U2ASKY cannot prevail in this appeal. That is, by failing to demonstrate error by the trial court regarding its analysis as to step one, which provides its own independent basis for dismissal of the TPPA petition, the trial court necessarily did not err in dismissing 4U2SKY's TPPA petition. Accordingly, we pretermit discussion of this second issue, whether the trial court erred in concluding that Mr. Offor made his prima facie case as to his counterclaim for intentional interference with business relationships.

4U2ASKY also contends that, even if Mr. Offor made his prima facie case for his claim for intentional interference with business relationships, the doctrine of res judicata, nevertheless, provides a full defense to Mr. Offor's tortious interference counterclaim. 4U2ASKY contends that this is another reason why the trial court's decision to dismiss its TPPA petition was in error. In opposition, Mr. Offor argues in support of the trial court's conclusion that res judicata is inapplicable to his counterclaim. Again, having determined that 4U2ASKY failed to make its prima facie showing that its communication falls within the protection of the First Amendment, 4U2ASKY cannot prevail in this appeal. That is, by failing to demonstrate error by the trial court with regard its analysis as to step one, which provides its own independent basis for dismissal of the TPPA petition, the trial court necessarily did not err by dismissing 4U2SKY's TPPA petition. Accordingly, we also pretermit discussion of this issue, whether 4U2ASKY established a valid defense to Mr. Offor's counterclaim.

VII.

Predicated upon its contention that the trial court erred by declining to dismiss Mr. Offor's action under the TPPA, 4U2ASKY asserts that the trial court erred by failing to award it attorney's fees, costs, and other expenses. Under Tennessee Code Annotated section 20-17-107(a),

> (a) If the court dismisses a legal action pursuant to a petition filed under this chapter, the court shall award to the petitioning party:
>
> (1) Court costs, reasonable attorney's fees, discretionary costs, and other expenses incurred in filing and prevailing upon the petition; and
>
> (2) Any additional relief, including sanctions, that the court determines necessary to deter repetition of the conduct by the party who brought the legal action or by others similarly situated.

However, having determined that the trial court did not err in declining to dismiss Mr. Offor's claim for intentional interference with business relationships by operation of the TPPA, we find no error in the trial court failing to award to 4U2ASKY attorney's fees,

costs, and other expenses.

## VIII.

Mr. Offor also challenges the trial court's determination as to attorney's fees and costs, but his contention is that the trial court erred by failing to award him attorney's fees pursuant to Tennessee Code Annotated section 20-17-107(b). This section provides that

> If the court finds that a petition filed under this chapter was frivolous or was filed solely for the purpose of unnecessary delay, and makes specific written findings and conclusions establishing such finding, the court may award to the responding party court costs and reasonable attorney's fees incurred in opposing the petition.

Tenn. Code Ann. § 20-17-107(b). While the trial court dismissed 4U2ASKY's TPPA petition, the trial court expressly determined that the petition "was not frivolous nor was it filed solely for the purpose of unnecessary delay."

Unlike Tennessee Code Annotated section 20-17-107(a), which is mandatory, a trial court's determination with regard to awarding attorney's fees and costs "pursuant to Tennessee Code Annotated § 20-17-107(b) is discretionary and should be reviewed by this Court under an abuse of discretion standard." *Pragnell*, 2023 WL 2985261, at *13. "An abuse of discretion occurs when the trial court applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *West v. Schofield*, 460 S.W.3d 113, 120 (Tenn. 2015).

From our review of the record and the arguments presented by the parties, we cannot conclude that the trial court abused its discretion by declining to find that 4U2ASKY's filing of TPPA petition in this case was frivolous or that its petition was filed solely for the purpose of unnecessary delay. The issues presented in connection with the TPPA petition in this case involve complex legal matters. The trial court's decision to dismiss 4U2ASKY's TPPA petition is, in our view, ultimately and plainly correct. However, that does not mean that 4U2ASKY's understanding of the facts and law as being a valid basis for seeking a TPPA based dismissal of Mr. Offor's claim for intentional interference with business relations constituted a frivolous petition. We certainly cannot say that the trial court abused its discretion by concluding that 4U2ASKY's TPPA petition is not frivolous. Furthermore, there is absolutely no showing or basis in this case to support a conclusion that the TPPA petition, challenging a counterclaim, was filed merely for purposes of unnecessary delay. Accordingly, we conclude the trial court did not abuse its discretion in declining to award attorney's fees and costs to Mr. Offor in the present case.

## IX.

For the aforementioned reasons, we affirm the judgment of the Chancery Court for Davidson County. Costs of this appeal are taxed to the appellant, 4U2ASKY Entertainment, Inc., for which execution may issue if necessary. The case is remanded for further proceedings consistent with this opinion.

_s/ Jeffrey Usman_
JEFFREY USMAN, JUDGE